[Cite as *State v. Reed*, 2014-Ohio-5463.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO


STATE OF OHIO,                    :        **O P I N I O N**

       Plaintiff-Appellee,         :

     - vs -                          :        **CASE NO. 2013-L-130**

TREVOR L. REED,                   :

       Defendant-Appellant.       :


Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 12 CR 000845.

Judgment: Affirmed.


*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Pamela D. Kurt*, 30432 Euclid Avenue, Suite 101, Wickliffe, OH 44092 (For Defendant-Appellant).


TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Trevor L. Reed, appeals the judgment of conviction and sentence entered by the Lake County Court of Common Pleas, following a jury trial on one count of aggravated arson. Appellant was sentenced to five years imprisonment. For the following reasons, the judgment of the trial court is affirmed.

{¶2} On March 26, 2013, appellant was indicted by appellee, the state of Ohio. The indictment alleged that appellant committed aggravated arson in violation of R.C. 2909.02(A)(1), a felony of the first degree. Specifically, the indictment stated:

> On or about the 4th day of September, 2012, in the Village of Madison, Lake County, State of Ohio, one Trevor L. Reed did by means of fire or explosion, knowingly create a substantial risk of serious physical harm to any person other than the offender.

{¶3} On April 26, 2013, appellant waived his right to be present at arraignment and entered a plea of not guilty. Appellant withdrew his not guilty plea on July 30, 2013, and entered a written plea of guilty to attempted aggravated arson, a lesser-included offense of the charge in the indictment. Sentencing on the guilty plea was scheduled for September 5, 2013.

{¶4} On September 5, 2013, appellant orally moved to withdraw his guilty plea. On September 6, 2013, the trial court granted appellant's motion to withdraw his guilty plea. The trial court also allowed appellant's counsel of record to withdraw and appointed the Lake County Public Defender to represent appellant. The trial court scheduled a jury trial for October 1, 2013.

{¶5} Appellee again extended a plea offer to appellant. However, appellant failed to appear at the scheduled October 1, 2013 hearing where it was planned that he would enter a plea of guilty to attempted aggravated arson. This hearing was alternatively scheduled as a jury trial in the event that the trial court was unable to procure a "knowing, intelligent, and voluntary" guilty plea. Appellant failed to appear because of an apparent suicide attempt, whereby appellant attempted to jump in front of a train. Appellee then withdrew any offer to allow appellant to plead to a lesser charge.

2

On October 2, 2013, the trial court issued a judgment entry revoking and declaring appellant's bond forfeited. The trial court also ordered a warrant for appellant's arrest.

{¶6} On November, 4, 2013, a three-day jury trial commenced. At trial, the following facts were adduced.

{¶7} Appellant was separated and living apart from his former wife, Crystal Reed. Appellant was living in an apartment that he shared with his then-girlfriend, Julianna Fellows, on West Main Street in Madison Village, Ohio. Appellant's two daughters, T.R., then 10 years old, and M.R., then 4 years old, also lived with appellant in the West Main Street apartment. The apartment was one of four units in the structure, which was built in the early 1900s.

{¶8} On September 3, 2012, appellant, along with his two daughters and Ms. Fellows, spent the Labor Day holiday at the Painesville Speedway watching drag races. The group returned to their apartment at around 10:00 p.m., at which time the girls were prepared for bed by appellant and Ms. Fellows. Appellant then smoked a cigarette on the apartment's porch before joining Ms. Fellows in bed.

{¶9} On September 4, 2012, Ms. Fellows was awakened by the apartment's smoke alarm. Ms. Fellows proceeded to get out of bed, went to the girls' bedroom, woke up M.R., and carried M.R. down the steps and outside of the apartment. Appellant's older daughter safely exited the house on her own while Ms. Fellows was awakening M.R. As she was exiting the apartment, Ms. Fellows saw "flames lighting up the inside of the room and the smoke billowing up into the ceiling." Ms. Fellows said it looked "like a bonfire."

{¶10} As Ms. Fellows was evacuating appellant's children and alerting the neighbors, appellant extinguished the fire by dousing the couch, where the fire was located, with three or four trashcans full of water from the kitchen sink. Ms. Fellows re-entered the apartment to retrieve her phone so that she could call for emergency services. As the fire was already extinguished by the time of their arrival, police and fire personnel began to investigate the cause of the fire.

{¶11} At trial, Patrolman Alex Gritton of the Madison Village Police Department testified that appellant claimed he was awakened by the sound of the smoke alarm. Patrolman Gritton also testified that appellant told him at the scene of the fire that when he went downstairs after hearing the smoke alarm, he noticed the front door was standing open. Appellant told Patrolman Gritton that he thought someone had broke into the apartment to set the couch on fire. Patrolman Gritton did not notice any signs of forced entry. Patrolman Gritton also observed the area of the fire and the damage to the couch. Finally, Patrolman Gritton testified to seeing what looked like wadded up paper stuffed between the couch cushions.

{¶12} Madison Fire District firefighter Joseph Purcell was the second witness called to testify on behalf of appellee. Mr. Purcell testified that he responded to the fire at around 5:30 a.m. Mr. Purcell further testified that appellant told him "somebody [had] broke into the house and set the fire." Mr. Purcell stated that appellant's two daughters were asleep at the time the fire started. As part of his investigation of the scene, Mr. Purcell preserved napkins that were "shoved down in between the cushions of [the] couch." Mr. Purcell also testified that some of the couch's polystyrene had melted as a result of an open flame. The wall behind the couch was also discolored by the fire, and

4

the paint was bubbled on the picture frame that hung above the couch. In his testimony, Mr. Purcell noted that edges of the napkins were burnt, but not the centers. Finally, Mr. Purcell testified that, based on his expert opinion, the picture frame above the couch was minutes away from igniting. When asked by the prosecutor whether the fire was "consistent with someone having stuffed napkins between those cushions purposely, and having lit them with a cigarette lighter," Mr. Purcell responded, "Yes. Very consistent."

{¶13} Lieutenant Gordon Thompson of the Painesville Township Fire Department also testified on behalf of appellee. Lieutenant Thompson testified that he is "a K-9 handler of an accelerant detection K-9, trained and certified by the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives." Lieutenant Thompson and his K-9 partner, Tahoe, were deployed to determine whether the fire involved the use of any sort of accelerant. Lieutenant Thompson and Tahoe did not locate any ignitable liquids at the scene.

{¶14} Crystal Reed was the next witness to testify on behalf of appellee. Ms. Reed testified that she and appellant were married in 2004. The couple had two daughters, T.R. and M.R. In March 2012, Ms. Reed and appellant filed the initial paperwork seeking a divorce. Ms. Reed testified that at the time of the fire, she and appellant were living "separate and apart" and that appellant was living with his then girlfriend, Ms. Fellows. On the morning of the fire, Ms. Reed received a text message from appellant stating Ms. Reed did not need to take M.R. to pre-school that day. Ms. Reed called appellant to ask why and was told by appellant that "someone had came in and set the couch on fire. And that he better, that I better hope that it was not me."

5

Investigators came to Ms. Reed's office to ask whether she was involved in starting the fire. At some point, they cleared Ms. Reed of any involvement.

{¶15} At trial, Ms. Reed testified to receiving a call from appellant on September 7, 2012. In that phone conversation, Ms. Reed asked appellant "why he did what he did." Ms. Reed testified that appellant responded that he "needed to buy time." Ms. Reed then ended the phone conversation. The following week, Ms. Reed sought a protection order for herself, T.R., and M.R. As a result of the fire, Ms. Reed testified that her daughters were "very emotional" and suffered many "sleepless nights."

{¶16} T.R., appellant's oldest daughter, testified that she saw smoke as she was evacuating the apartment. When asked by the prosecutor how much smoke she saw, T.R. responded, "about to fill the room, I think." T.R. also testified she witnessed appellant extinguish the fire.

{¶17} Appellee's next witness was appellant's girlfriend at the time of the fire, Julianna Fellows. Ms. Fellows testified she was awakened by the smoke alarm and saw appellant "kneeling on the side of the bed." Ms. Fellows instructed T.R. to go outside and then assisted M.R. down the steps and outside. Appellant announced to Ms. Fellows that the couch was on fire. As she was leaving the apartment, Ms. Fellows saw "flames lighting up the inside of the room and the smoke billowing up into the ceiling." Ms. Fellows said it looked "just like a bonfire."

{¶18} After ensuring appellant's two daughters were safe, Ms. Fellows re-entered the apartment to retrieve her phone and called emergency services. She also ensured that the other individuals living in adjacent apartments were safely evacuated. Ms. Fellows testified that appellant told police and fire crews that he thought someone

6

broke into the apartment to start the fire. Ms. Fellows also testified that she noticed the previously full napkin holder was completely empty after the fire.

{¶19} Ms. Fellows further testified that on September 6, 2012, she visited appellant while he was in the hospital for a mental health evaluation. According to her testimony, appellant confessed he set the fire because he "lost a wheel." A little over a week later, Ms. Fellows also filed for an order of protection against appellant. She testified that, based on her conversation with appellant, she believed appellant intended to start the fire.

{¶20} Next to testify on behalf of appellee was Detective Timothy Doyle of the Madison Township Police Department. The day of the fire, Detective Doyle interviewed appellant who declared that he believed somebody entered the residence and started the fire while he was in bed.

{¶21} On September 6, 2012, Detective Doyle interviewed appellant, for a second time, at the Madison Village Police Department. During the interview, appellant admitted to taking napkins, putting them in the couch, and lighting them with a lighter. Appellant also acknowledged that the fire had the potential to harm others.

{¶22} Appellee's final witness was Chief Dawn Shannon of the Madison Village Police Department. Chief Shannon testified that no cigarette butts were found in the house. Chief Shannon also testified that during the September 6, 2012 interview, appellant never indicated the couch fire was an accident of any kind.

{¶23} After the prosecution rested, appellant testified in his own defense. Appellant testified that after returning home from the drag races, he and M.R. sat on the couch while she had a glass of chocolate milk. Appellant testified that he had a habit of

sticking napkins between the cushions "just in case she made a mess, or for any particular reason."

{¶24} Appellant testified that he woke up around 5:00 a.m. to smoke a cigarette. Instead of smoking outside like he normally does, appellant testified that he smoked this cigarette on the couch. Appellant claimed that he used the napkins that had been stuffed between the couch cushions as an ashtray. After finishing his cigarette, appellant testified that he disposed of the cigarette butt in the toilet and went back upstairs to bed. Appellant was later awoken by the smoke alarm. Appellant then told Ms. Fellows to get the girls out of the apartment while he used an empty trashcan to douse water onto the fire.

{¶25} While testifying in his own defense, appellant admitted that he lied when he previously stated someone came into the house and started the fire. Appellant instead insisted that the fire was an accident, the result of carelessly using a napkin as an ashtray. Finally, appellant testified that his confession to police was "an absolute lie" and that he never confessed to either Ms. Fellows or Ms. Reed. Appellant admitted on cross-examination that he never made any statement to police that the fire was an accident.

{¶26} On re-direct, appellant stated the reason he did not immediately admit that the fire was an accident:

> I was an idiot for using a napkin for an ashtray, and then outright told them a lie over and over, because I was too scared to take responsibility. And at that time—and he was looking at me, and he kept asking me questions, and I was—and they knew I have no background of ever trying to hurt nobody.

8

**{¶27}** On November 7, 2013, a jury found appellant guilty of aggravated arson, a felony of the first degree, in violation of R.C. 2909.02(A)(1). The trial court sentenced appellant to five years imprisonment. The trial court also ordered that appellant shall register annually as an arson offender for life, as set forth in R.C. 2909.14-15.

**{¶28}** Appellant timely appeals the judgment of conviction and sentence and sets forth six assignments of error for our review.

**{¶29}** As his first assignment of error, appellant states:

**{¶30}** "The Appellant's conviction was based upon insufficient evidence was otherwise against the sufficient and/or manifest weight of the evidence and not beyond a reasonable doubt contrary to Ohio law and the State and Federal Constitutions."

**{¶31}** We first begin with appellant's sufficiency argument. Appellant argues that appellee failed to prove the elements of aggravated arson beyond a reasonable doubt.

**{¶32}** When measuring the sufficiency of the evidence, an appellate court must consider whether the state set forth adequate evidence to sustain the jury's verdict as a matter of law. *City of Kent v. Kinsey*, 11th Dist. Portage No. 2003-P-0056, 2004-Ohio-4699, ¶11, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A verdict is supported by sufficient evidence when, after viewing the evidence most strongly in favor of the prosecution, there is substantial evidence upon which a jury could reasonably conclude that the state proved all elements of the offense beyond a reasonable doubt. *State v. Schaffer*, 127 Ohio App.3d 501, 503 (11th Dist.1998), citing *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-15 (Dec. 23, 1994).

9

**{¶33}** Appellant was found guilty of a violation of R.C. 2909.02(A)(1), which states: "No person, by means of fire * * *, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender[.]"

**{¶34}** Pursuant to R.C. 2901.22(B), a person acts knowingly, "regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

**{¶35}** A substantial risk is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

**{¶36}** Finally, pursuant to R.C. 2901.01(5), serious physical harm to persons means any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶37}** The evidence produced at trial demonstrates the state put forth substantial evidence upon which a jury could reasonably conclude that appellee proved all elements of the offense beyond a reasonable doubt.

10

{¶38} First, there was sufficient evidence to find that appellant acted knowingly. The trial court heard the testimony of Ms. Fellows and Ms. Reed about self-incriminating statements appellant made days after the fire. Additionally, the trial court reviewed appellant's self-incriminating statements made while being interviewed by police on September 6, 2012, at the Madison Village Police Department. At trial, appellant claimed that his confession to police was "an absolute lie" and that he never confessed to either Ms. Fellows or Ms. Reed. The trial court was free to believe all, part, or none of appellant's own trial testimony. *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996). The verdict reached by the jury reflects the fact that the jury was not persuaded by appellant's own testimony and found the testimony of Ms. Fellows and Ms. Reed more persuasive. Additionally, appellee put forth significant additional evidence to reflect that appellant acted knowingly. Included in this evidence is the testimony of firefighter Purcell who stated that the burn patterns on the napkins were very consistent with someone having lit them with a cigarette lighter. Accordingly, our review of the record demonstrates there was sufficient evidence for the jury to find that appellant acted knowingly.

{¶39} Appellee also offered sufficient evidence for the jury to find that appellant created a substantial risk of serious physical harm. Specifically, the jury heard testimony about appellant's apartment and the additional dangers that fires present in older structures. The jury also heard the testimony of appellant's daughter, T.R., and Ms. Fellows who saw smoke filling the apartment's living room. In her testimony, Ms. Fellows compared the couch fire to a bonfire. The jury also heard testimony about the dangers of smoke inhalation and carbon monoxide poisoning which are strong risks that

accompany house fires. Furthermore, the fact that the fire occurred at night when appellant's girlfriend, children, and neighbors were likely to be asleep also shows that appellant created a substantial risk of serious physical harm. The fact that appellant extinguished the fire before any serious physical harm resulted does not negate the fact that appellant created a substantial risk of serious physical harm. Accordingly, there was sufficient evidence for the trial court to find appellant guilty of violating R.C. 2909.02 beyond a reasonable doubt.

{¶40} Under his first assignment of error, appellant also maintains the trial court's finding of guilt is against the manifest weight of the evidence.

{¶41} To determine whether a verdict is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the trier of fact "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In weighing the evidence submitted at a criminal trial, an appellate court must defer to the factual findings of the trier of fact regarding the weight to be given the evidence and credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶42} As we previously discussed, the jury found appellant's testimony to be unpersuasive. Instead, the jury believed appellee's version of events and relied on the incriminating statements made by appellant to Ms. Reed, Ms. Fellows, and police investigators. Nothing in the record indicates the jury lost its way in finding appellant

12

guilty of violating R.C. 2909.02.  Accordingly, the finding of guilt was not against the manifest weight of the evidence.

**{¶43}** Appellant's first assignment of error is not well taken.

**{¶44}** In his second assignment of error, appellant asserts:

**{¶45}** "The Appellant was denied a fair trial guaranteed by Federal and Ohio laws and Constitutions through the opening statement, trial, and closing statements of the Prosecutor in front of the jury."

**{¶46}** Under this assignment of error, appellant alleges the prosecutor's remarks, arguments, and prayers were plain error and affected the outcome of the trial.

**{¶47}** The following exchanges occurred during appellee's cross-examination of appellant:

> Prosecutor:  Now let me tell you what we're not gonna do.  We're not gonna insult this jury's intelligence by coming up with more lies during our conversation.
>
> Defense Counsel:  Objection, Your Honor.
>
> [Court]:  Sustained.
>
> Prosecutor:  When you and I talk from now on, we're gonna talk about things that happened, that are facts in this case.
>
> Defense Counsel:  Objection, Your Honor.
>
> [Court]:  Sustained.
>
> * * *
>
> Prosecutor:  So I'm gonna offer you, figuratively, my hand.  Right here and right now.  And we're gonna talk about what the truth is.  It's your last chance.
>
> Defense Counsel:  Your Honor, I'm gonna object to this line of questioning.
>
> [Court]:  Sustained.

13

\* \* \*

Prosecutor: Now you think if you had asked Julianna prior to doing what you did, in starting that fire, should I do this? She would have said don't do it. Right?

Defense Counsel: Objection, Your Honor.

[Court]: Sustained.

Prosecutor: Had you taught 11 year old [T.R.] about the dangers of playing with fire?

Defense Counsel: Objection.

[Court]: Sustained, I'll tolerate \* \* \* few more objections after that.

{¶48} During appellee's closing argument, the prosecutor stated:

I almost feel like we should have a moment of silence. And then somebody should say amen. And I'm not trying to attack a witness, but that closing argument was a prayer for you folks. It was a prayer to take sympathy on this defendant.

{¶49} The test for prosecutorial misconduct is whether the remarks of the prosecutor were improper and, if so, whether they prejudiced the defendant. *State v. Triplett*, 11th Dist. Ashtabula No. 2013-A-0018, 2013-Ohio-5190, ¶76, citing *State v. Smith*, 14 Ohio St.3d 13, 15 (1984).

{¶50} "'Generally, prosecutorial misconduct is not a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the defendant of a fair trial.'" *State v. Dudas*, 11th Dist. Lake Nos. 2008-L-109 & 2008-L-110, 2009-Ohio-1001, ¶26, quoting *State v. Hillman*, 10th Dist. Franklin Nos. 06AP-1230 & 07AP-728, 2008-Ohio-2341, ¶26. "An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks substantially prejudiced appellant." *State v. Bruce*, 8th Dist.

14

Cuyahoga No. 70982, 1997 Ohio App. LEXIS 4334, *19 (Sept. 25, 1997). "In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether, absent the improper questions or remarks, the jury would have found the appellant guilty." *Id.* The focus of that inquiry is on "the fairness of the trial, not the culpability of the prosecutor." *Id.*

{¶51} In this case, the prosecuting attorney aggressively cross-examined appellant about his inconsistent statements. Appellant's attorney quickly objected to these questions, and the trial court sustained appellant's objections. The trial court's jury instructions stated that the jury may not consider "any statements that were stricken by the Court or that you were instructed to disregard." Additionally, we cannot conclude that any of the prosecuting attorney's statements cast doubt on the fairness of appellant's trial. Accordingly, appellant's second assignment of error is not well taken.

{¶52} In his third assignment of error, appellant argues:

{¶53} "The Appellant was denied his rights contrary to Ohio law and the State and Federal Constitutions when the trial court permitted, over objection and motion *in limine*, the Appellant's wife, even though separated, to testify about an alleged confession of guilty."

{¶54} Specifically, appellant asserts that because he and Ms. Reed were still married at the time of the incident, it was error for the trial court to allow Ms. Reed to testify about "an alleged confession of guilt [made by appellant] while he was in the hospital being treated for mental health issues."

{¶55} R.C. 2945.42 states, in part:

> Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the

15

other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness * * *.

**{¶56}** As such, R.C. 2945.42 only makes privileged certain communications between spouses that take place during coverture. "Coverture suggests a man and a woman are married under the law, whether by license or common law, and *cohabitating as such.*" *Village of Bentleyville v. Pisani*, 100 Ohio App.3d 515, 517 (8th Dist.1995) (emphasis added).

**{¶57}** The traditional justification for the spousal privilege is the underlying principle that it is necessary to promote peace and marital harmony. *State v. Mowery*, 1 Ohio St.3d 192, 198 (1982). In this case, no such justification exists. Appellant and Ms. Reed had been separated since October 2011 and were in the process of obtaining a divorce when appellant made self-implicating statements to Ms. Reed. Indeed, appellant was living with his then-girlfriend, Ms. Fellows. As such, appellant and Ms. Reed were no longer "in coverture." Accordingly, the trial court did not err in allowing Ms. Reed to testify over appellant's objection.

**{¶58}** Appellant's third assignment of error is not well taken.

**{¶59}** In his fourth assignment of error, appellant argues:

**{¶60}** "The trial court erred in not granting the Appellant's Motion for Acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure and Ohio and Federal law and Constitutions."

**{¶61}** "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶37. Having already

16

found that appellant's conviction was based on sufficient evidence, appellant's fourth assignment of error is without merit.

**{¶62}** Appellant's fifth assignment of error states:

**{¶63}** "The Appellant was denied due process and other laws and rights by a sentence contrary to Ohio law and the State and Federal Constitutions."

**{¶64}** Specifically, appellant alleges the trial court failed to adequately consider appellant's lack of a prior criminal record, the fact that no person was injured, and appellant's diagnosed mental health conditions.

**{¶65}** Ohio's felony-sentencing scheme allows judges to exercise discretion within established statutory bounds. *State v. Ries*, 11th Dist. Portage No. 2008-P-0064, 2009-Ohio-1316, ¶13, citing *State v. Mathis*, 109 Ohio St.3d 54 (2006), paragraph three of the syllabus. Despite having significant latitude to sentence, sentencing courts are required to follow statutory direction in choosing a prison term. *State v. Belew*, 140 Ohio St.3d 221, 2014-Ohio-2964, ¶10 (Lanzinger, J., dissenting).

**{¶66}** In 2011, the Ohio General Assembly passed Am.Sub.H.B. No. 86 ("H.B. 86"). H.B. 86 reflects the General Assembly's intent that appellate review of sentences be governed by R.C. 2953.08(G). R.C. 2953.08(G)(2) states:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

17

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶67} Accordingly, although the trial court has discretion to impose a sentence within the statutory range, this court utilizes R.C. 2953.08(G) as the standard of review in all felony sentencing appeals.

{¶68} Appellant argues that his sentence was excessive and contrary to the purposes of felony sentencing. A felony sentence should be reasonably calculated "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). A court imposing a felony sentence is required to consider seriousness and recidivism factors found in R.C. 2929.12. It is well established, however, that a trial court is "not required to make findings of fact under the seriousness and recidivism factors in R.C. 2929.12." *State v. ONeil*, 11th Dist. Portage No. 2010-P-0041, 2011-Ohio-2202, ¶34.

{¶69} At appellant's sentencing hearing, the trial court stated the following:

[T]he Court's considered the record, the oral statements made, victim impact, pre-sentence report, comprehensive psychological evaluation, my conference with counsel and probation previously, and all of the prior hearings in this case, and the statements of the [appellant] and [appellant]'s counsel. The Court's also considered the overriding purposes of felony sentencing pursuant to R.C. 2929.11 which are to protect the public from future crime by this offender and others similarly situated, and to punish this offender using the minimum sanctions that the Court determines accomplish the process without imposing an unnecessary burden on state or local governmental resources. I have considered the need for

18

incapacitation, deterrence, rehabilitation and restitution. The Court has considered the separate recommendations of the parties. I have reasonably calculated this sentence to achieve the two overriding purposes of felony sentencing and to be commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on society and the victims. * * * In using my discretion to comply with the purposes and principles of sentencing I have considered all relevant factors including the seriousness and the recidivism factors set forth in R.C. 2929.12. The victims were young, particularly the youngest child. The court understands that a fire in the residence in the middle of the night would be accompanied by some psychological harm. [Appellant] had a relationship with the victims that facilitated the offense. Not only did he commit the offense, but he would be obligated to prevent someone else from committing this offense. He didn't cause physical harm to someone, however he didn't take the means to guarantee that there would be no physical harm caused to anyone. He has no prior record. The court fails to find genuine remorse.

{¶70} Additionally, in its judgment entry of sentence, the trial court declared:

The Court has considered the record, oral statements, any victim impact statement, the pre-sentence report and/or drug and alcohol evaluation submitted by the Lake County Adult Probation Department of the Court of Common Pleas, as well as the principles and purposes of sentencing under R.C. 2929.11, and has balanced the seriousness and recidivism factors under R.C. 2929.12.

In considering the foregoing, and for the reasons stated in the record, this Court finds that a prison sentence is consistent with the purposes and principles of sentencing set forth in R.C. 2929.11 and that [appellant] is not amenable to any available community control sanction.

{¶71} Our review of the trial court record shows that the trial court's findings under R.C. 2929.13 and R.C. 2929.14 are supported by the record. Additionally, our review shows that the sentencing court considered the purposes and principles of felony sentencing contained in R.C. 2929.11 and R.C. 2929.12 before imposing appellant's sentence. While it may be that this court would have chosen a different sentence, the

19

fact remains that appellant's sentence is not clearly and convincingly contrary to law. Accordingly, the five-year term of imprisonment imposed by the trial court is affirmed.

{¶72} Appellant also argues that the trial court erred in requiring him to register pursuant to R.C. 2909.14 and R.C. 2909.15, Ohio's arson offender registry.

{¶73} Ohio's arson offender registry, contained in R.C. 2909.14 and R.C. 2909.15, became effective July 1, 2013. The law requires convicted arsonists to register with their local sheriff's office annually. Pursuant to R.C. 2909.15(C)(2), the annual registration form completed by each arson offender must include:

> (a) The arson offender's * * * full name and any alias used;
>
> (b) The arson offender's * * * residence address;
>
> (c) The arson offender's * * * social security number;
>
> (d) Any driver's license number, commercial driver's license number, or state identification card number issued to the arson offender * * * by this or another state;
>
> (e) The offense that the arson offender * * * was convicted of or pleaded guilty to;
>
> (f) The name and address of any place where the arson offender * * * is employed;
>
> (g) The name and address of any school or institution of higher education that the arson offender * * * is attending;
>
> (h) The identification license plate number of each vehicle owned or operated by the arson offender * * * or registered in the arson offender's * * * name, the vehicle identification number of each vehicle, and a description of each vehicle;
>
> (i) A description of any scars, tattoos, or other distinguishing marks on the arson offender * * *;
>
> (j) Any other information required by the attorney general.

20

**{¶74}** This arson offender information is retained in a central database maintained by the Ohio Attorney General's Office. With limited exception, an arson offender's duty to register continues for life. *See* R.C. 2909.15(D)(2)(a). Failure to comply with the registration requirements is a felony of the fifth degree. R.C. 2909.15(H).

**{¶75}** Appellant argues that the application of the arson offender registry to him violates the ex post facto clause of the United States Constitution and the prohibition against retroactive laws in the Ohio Constitution. We note that this appears to be the first challenge to Ohio's arson offender registry being imposed retroactively.

**{¶76}** Article 1, Section 10, cl.1 of the U.S. Constitution provides that "No State shall * * * pass any * * * ex post facto Law * * *." The United States Supreme Court has interpreted this to prohibit "any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission * * *." *Beazell v. Ohio*, 269 U.S. 167, 169 (1925).

**{¶77}** The ex post facto clause applies only to criminal statutes. *State v. Cook*, 83 Ohio St.3d 404, 415 (1998), citing *California Dept. of Corr. v. Morales*, 514 U.S. 499, 504 (1995). Ohio courts have used the "intent-effects" test to evaluate whether a statute's enforcement is void as being passed ex post facto. *See, e.g., Cook, supra,* at 415.

**{¶78}** The intent prong requires reviewing courts to determine whether the General Assembly's intent in promulgating R.C. 2909.14 and R.C. 2909.15 was penal or remedial. A court must look to the language and purpose of the statute in order to

21

determine legislative intent. *State v. S.R.*, 63 Ohio St.3d 590, 594-595 (1992); *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105 (1973).

{¶79} The language of R.C. 2909.14 and R.C. 2909.15, as included above, reveals the General Assembly's intent was to promote public safety. R.C. 2909.14 and R.C. 2909.15 essentially require that an arson offender annually register in the county in which the offender resides. Registration with the sheriff's department allows law enforcement officials to remain vigilant about possible recidivism by arson offenders. Therefore, registration objectively serves the remedial purpose of protecting the local community from repeat arson offenders.

{¶80} Accordingly, we find the General Assembly's intent with regard to R.C. 2909.14 and R.C. 2909.15 to be civil in nature, not punitive.

{¶81} We now turn to the effects prong. In determining whether a statute is punitive, a "civil label is not always dispositive." *Allen v. Illinois,* 478 U.S. 364, 369 (1986). However, only "the clearest proof" will be adequate to show that a statute has a punitive effect so as to negate a declared remedial intention. *Id.; Flemming v. Nestor*, 363 U.S. 603, 617 (1960).

{¶82} "There is no absolute test to determine whether a retroactive statute is so punitive as to violate the constitutional prohibition against *ex post facto* laws; such a determination is a 'matter of degree.'" *State v. Cook, supra,* at 418. In determining whether a statute is punitive, the United States Supreme Court has considered the following:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment --

22

retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned * * *.

(Footnotes omitted.) *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963).

{¶83} Here, Ohio's arson offender registry requires all convicted arsonists to register various pieces of information annually. While the act of registering may cause some inconvenience, it does not restrain the offender in any way. Instead, the arson offender registry requirements constitute a de minimus administrative requirement. Indeed, the requirements of the registry are less stringent to previously upheld sex offender registries. *See, e.g., Cook.* For example, unlike previously upheld sex offender registries, the arson offender registry is not publicly accessible. Accordingly, we hold that Ohio's arson offender registry does not violate the ex post facto clause of the United States Constitution.

{¶84} We now address whether Ohio's arson offender registry violates the prohibition against retroactive laws found in the Ohio Constitution. Article II, Section 28 of the Ohio Constitution provides that "[t]he general assembly shall have no power to pass retroactive laws[.]" "'Every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective or retroactive.'" *Van Fossen v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 106 (1988), quoting *Cincinnati v. Seasongood*, 46 Ohio St. 296, 303 (1889). In other words, a court must consider whether a statute is substantive or merely remedial in determining whether a statute is unconstitutionally retroactive. *Cook, supra,* at 410-411. "A statute is 'substantive' if it impairs or takes away vested rights, affects

23

an accrued substantive right, imposes new or additional burdens, duties, obligation or liabilities as to a past transaction, or creates a new right. *Id.* at 411. Conversely, "remedial" laws affect only the remedy provided. *Id.* A remedial statute, even if retroactive, does not violate Article II, Section 28 of the Ohio Constitution. *Id.*

**{¶85}** The sex offender registration requirements were significantly increased by revisions to Megan's Law. The Ohio Supreme Court ultimately found that the registration requirements had become punitive and, therefore, not subject to retroactive application. *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, ¶15. However, we find persuasive the reasoning of the Ohio Supreme Court in *Cook*, which upheld retroactive application of Ohio's Megan's Law, prior to its punitive revisions. *Cook*, *supra*, at 423. The requirements of Ohio's arson offender registry are less onerous then those considered under Megan's Law in *Cook*, even if registration requirements are for life. We also rely on the fact that the arson offender registry is not a public record. R.C. 2909.15(E)(2). Additionally, registration is only once a year, and the fees to register are minimal. R.C. 2909.15(D)(1) & (F). For this reason, the statute is merely remedial and is not unconstitutionally retroactive as applied to appellant's classification.

**{¶86}** Accordingly, as we see no error with appellant's sentence, his fifth assignment of error is not well taken.

**{¶87}** In his sixth and final assignment of error, appellant asserts:

**{¶88}** "The Appellant was denied effective assistance of counsel contrary to Ohio law and the State and Federal Constitutions due to his ineffective assistance of trial counsel."

24

{¶89} The standard of review for ineffective assistance of counsel was stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard has been repeatedly followed by the Ohio Supreme Court and by this court. *See, e.g., State v. Gillard*, 40 Ohio St.3d 226, 234 (1988); *State v. Haney*, 11th Dist. Lake 2012-L-098, 2013-Ohio-2823, ¶10.

{¶90} In order to support a claim of ineffective assistance of counsel, the defendant must satisfy a two-pronged test. First, the defendant must show that counsel's performance was deficient. *Strickland, supra*, at 687. This requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. The defendant bears the burden of proving that trial counsel's assistance fell below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), citing *Strickland, supra*, at 687-688. Because there are many ways to provide effective assistance, there is a strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance. *Id.,* citing *Strickland* at 689.

{¶91} Second, the defendant must show the deficient performance prejudiced the defense. In order to satisfy this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's * * * errors, the result of the [trial] would have been different." *Strickland* at 694; accord *Bradley*, paragraph three of the syllabus.

{¶92} In alleging that trial counsel provided ineffective assistance, appellant states:

> The Appellant will not rehash the evidence of ineffective assistance
> of counsel provided in the other Assignments of Error and the

25

Appellant expressly incorporates those facts and arguments herein. However, it is important to note that the Appellant wanted to call additional witness[es], including his landlord who would testify as to the minimal damage to the wall and/or structure. The Appellant also wanted additional evidence of his mental health condition and additional evidence and pictures regarding the minimal yellow stain on the wall and couch condition. The Appellant was even prevented from introducing rebuttal evidence, including testimony from individuals, regarding Ms. Fellow's lies about the Appellant purportedly admitting to setting napkins on fire and leaving them on the couch.

{¶93} Our review of the record and appellant's merit brief does not meet the test for ineffective assistance of trial counsel as set forth in *Strickland*. We note that the decision as to whether to call a witness is generally a matter of trial strategy and, absent a showing of prejudice, does not deprive a defendant of effective assistance. *State v. Williams*, 74 Ohio App.3d 686, 695 (8th Dist.1991), citing *State v. Reese*, 8 Ohio App.3d 202, 203 (1st Dist.1982).

{¶94} Appellant's attorney may have decided not to call appellant's landlord to testify because the actual amount of damage done to the apartment would not aid in disproving any element of the underlying offense. Furthermore, the jury already had significant evidence about the relatively minor amount of damage actually done to the apartment. Finally, appellant's counsel cross-examined Ms. Fellows about the incriminating statements made by appellant.

{¶95} Appellant fails to demonstrate that his trial counsel's performance fell below an objective standard of reasonable representation or demonstrate any prejudice by trial counsel's alleged ineffective assistance. Therefore, appellant's sixth assignment of error is not well taken.

26

{¶96} As all of appellant's assignments of error are without merit, the judgment of conviction and sentence entered by the Lake County Court of Common Pleas is hereby affirmed.

DIANE V. GRENDELL, J.,

CYNTHIA WESTCOTT RICE, J.

concur.